# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **PEGGY SUE KNOX** | **CIVIL ACTION NO. 07-606** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **CITY OF MONROE AND DON HOPKINS** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

This is an employment discrimination action brought by Plaintiff Peggy Sue Knox ("Knox") against her former employer, City of Monroe ("the City"), and her former supervisor, Don Hopkins ("Hopkins"). Among other claims, Knox alleges that the City discharged her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.[1]

Defendants have filed a Motion for Partial Summary Judgment [Doc. No. 45], which is opposed by Knox. For the following reasons, Defendants' Motion for Summary Judgment is GRANTED.

**I.　FACTS**

On September 25, 1998, Knox[2] applied to work for the City as a full-time sanitation driver.

---

[1] Knox did not assert an ADA claim against Hopkins individually. Also pending before the Court are Defendants' motions for summary judgment on Knox's claims under 42 U.S.C. §§ 1981 and 1983 and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654. The Court will address those dispositive motions in a separate ruling.

[2] At the time, Knox was known as Peggy Copeland. For consistency, however, the Court will refer to her by the name under which she filed her Complaint, Knox.

On or about November 11, 1998,[3] Knox began her employment with the City as a truck driver in the Sanitation Department, a division of the Public Works Department.

In 1999, Hopkins became the Recreation Center Supervisor. He had worked in the Recreation Department since 1989.

Although Knox and Hopkins did not work together and Hopkins claims that he did not know her, Knox saw Hopkins at union meetings for all employees every two to three months.

On or about September 3, 2002, Knox sustained a work-related injury when the metal end of a bungee strap struck her in the left eye ("the accident"). Knox's right eye was not injured. A supervisor in the Sanitation Department took Knox to Dr. Priscilla Perry-Arnold[4] ("Perry-Arnold"), an opthamologist, for treatment. Dr. Perry-Arnold determined that Knox's left pupil was partially dilated and that she had a cataract on her lens as a result of the accident. She placed Knox on bed rest for six days.

On September 9, 2002, Knox returned to see Dr. Perry-Arnold. After examining her, Dr. Perry-Arnold released her to return to work as a driver, but restricted her from heavy lifting or pulling to prevent further bleeding in her eye. Knox's supervisor at the time, Don Spatafora ("Spatafora"), assigned a helper to work with her for at least two weeks.

On September 13, 2002, Knox again returned to see Dr. Perry-Arnold. Dr. Perry-Arnold found that Knox still had a mild cataract and dilated pupil, but released her to work without

---

[3] In her affidavit, Knox states that she began her employment on November 9, 1998, but she admitted the accuracy of the City's statement that she began employment on November 11, 1998. [Doc. Nos. 45-2, 62-2, & 62, Exh. A]. The specific date is not material, however.

[4] At time of Knox's injury, Dr. Perry-Arnold was known as Dr. Perry. She married a short time later and is now known as Dr. Arnold. For consistency, the Court will refer to her as Dr. Perry-Arnold throughout the Ruling.

restrictions the following Monday (one week later).

On September 19, 2002, Knox returned to Dr. Perry-Arnold because she was suffering from blurred vision and severe headaches. Dr. Perry-Arnold told Knox that the pupil might remain permanently dilated from the accident, a condition known as mydriasis. She advised that Knox could obtain cosmetic contact lenses, so that no one could tell her pupil is dilated. Dr. Perry-Arnold also testified that the cosmetic contact lens would cut down on the amount of light entering her left eye, although Knox denies that Dr. Perry-Arnold told her of this benefit. Dr. Perry-Arnold asked Knox to return in one month for a follow up.

During the September 19, 2002 visit, Knox asked for a note from Dr. Perry-Arnold stating that she was restricted from working in the sunlight. Dr. Perry-Arnold has no copy of such a note in her medical record, but Knox recalls providing the note to the City. It is undisputed that Dr. Perry-Arnold never asked that Knox be reassigned to a particular position and never placed any restrictions on indoor lighting.

Around the end of September 2002, Knox requested that she be moved to an inside position. She began working as a clerk in the Sanitation Department, but did not receive a reduction in her pay or benefits. Her dilated pupil and cataract did not prevent Knox from performing the essential duties of a clerk, and she never requested an accommodation in this position. Knox answered telephones, handled customer complaints, did some arithmetic calculations, filled out forms, and assisted co-workers with their assignments.

In addition to her job duties, Knox continued to perform housework after the accident.

On October 25, 2002, Knox returned to see Dr. Perry-Arnold. At that time, her corrected vision was 20/25 in her left eye and 20/20 in her right eye. Dr. Perry-Arnold asked her to return

for a follow-up in one year.

On April 24, 2003, the City's workers' compensation adjuster, Mor-Tem, inquired by letter to Dr. Perry-Arnold whether Knox could work as a truck driver if she wore prescription sunglasses.

On May 13, 2003, Dr. Perry-Arnold responded to Mor-Tem by letter, stating that a "pair of prescription sunglasses will decrease the problem with glare," but that she did "not know whether or not this will make it possible for [Knox] to work in her previous job comfortably." Mor-Tem paid for a pair of prescription sunglasses for Knox.

On May 29, 2003, Knox returned to see Dr. Perry-Arnold. At that time, Knox requested a letter stating that she need to work inside, but Dr. Perry-Arnold has no record of providing such a note. Dr. Perry-Arnold did not examine or treat Knox after May 29, 2003, because no additional treatment options were available for her cataract and hydriasis.

In August 2004, Knox obtained a second job as a "nighttime" driver for the West Ouachita Senior Center. She transported people in a Dodge van to and from their jobs on Saturdays and Sundays. She worked either in the afternoon from 4:00 P.M. to 5:30 P.M. or in the evening from 8:00 P.M. to 11:00 P.M., working between 12 and 15 hours each weekend. Knox did not inform the City that she had this second job because she did not believe she needed to do so.

In October 2004, Hopkins began working as the Sanitation Supervisor. When he came into the position, he found that the Department had a problem with excessive absenteeism and the employees had low morale, in part because of the absenteeism.

On October 25, 2004, Hopkins created a list of approximately 51 employees who had

excessive absences. Knox was one of the employees on the list. Hopkins circulated and posted the list of employees. However, Knox asserts that Hopkins never informed employees of a change in the attendance policy.

At some point, a City custodian, Michael White ("White") overheard Hopkins say that there was "nothing wrong" with Knox's eye and that she needed "to get back in the field."[5]

By the end of 2004, Knox had exhausted her 96 hours of accrued sick leave. In late December 2004 or early January 2005, Knox had a conversation with Hopkins, explaining that she had health problems she was trying to resolve.

In January 2005, despite not having accrued additional sick leave, she was absent ten (10) days without pay for reasons unrelated to her eye. In late January 2005, Hopkins spoke with Knox about her absences and offered her the opportunity to apply for leave under the FMLA if she needed to do so.[6] Knox declined.

A short time later, on January 27, 2005, Knox was again absent. When Knox returned to work, Hopkins fired her for the stated reason of her excessive absenteeism. Hopkins also fired seven other City employees for excessive absenteeism, none of whom had a disability.

Following her termination, Knox continued to work as a driver for the West Ouachita Senior Citizen Center ("Senior Citizen Center"). In addition to her weekend hours, she began

---

[5]The City has objected that the Court should not consider an affidavit given by White in this matter because Knox previously asserted attorney-work product protection. The Court need not address that objection in this ruling because White made the statement relied on by the Court in his deposition.

[6]According to Hopkins, he offered family and medical leave to Knox and similarly situated employees to assist the employees and to allow him to fill a position temporarily. He testified that he told Knox that she was subject to discharge if she was absent again. Knox denies that Hopkins warned her that she was facing discharge.

driving for the Senior Citizen Center during the week.. Knox worked as a driver until the program was discontinued in July 2006.

In September 2006, Knox underwent a physical examination and vision test to renew her commercial driver's license ("CDL") endorsement. She obtained the CDL endorsement, as well as a tanker endorsement on her current driver's license.

## II. LAW AND ANALYSIS

### A. Standard of Review

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B. ADA

Under the ADA, a covered employer "shall [not] discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).

Knox asserts all three types of disability claims. She contends that the City discriminated against her because of her actual disability (her mydriasis and cataract), because she had a record of disability, and because she was regarded as disabled.

When an ADA plaintiff relies upon circumstantial evidence[7], the Court applies the traditional *McDonnell-Douglas* burden-shifting analysis. *See McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000). "Under this framework, a plaintiff must first make a prima facie showing of discrimination by establishing that: (1)[sh]e is disabled, has a record of disability, or is regarded as disabled; (2) [s]he is qualified for the job; (3) [s]he was subjected to an adverse employment action on account of h[er] disability; and (4) [s]he was replaced by or treated less favorably than non-disabled employees." *Id.* at 279-80. "Once the plaintiff makes h[er] prima facie showing, the burden [of production] . . . shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 280. If the defendant-employer carries its burden of production, "the plaintiff must then offer

---

[7]Knox admits that Hopkins never said that he was discharging her because of her eye impairment.

7

sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312-13 (5th Cir. 2004) (citations and internal quotation marks omitted).

          1.        **Actual Disability**

First, Knox contends that the City violated the ADA by discriminatorily discharging her because of her disability, her mydriasis and cataract. The City moves for summary judgment, arguing that Knox cannot establish a prima facie case because she cannot show that she was disabled, that she was qualified for her job, or that she was treated less favorably than other non-disabled employees. Even if the Court were to find that Knox met her prima facie burden, the City argues that Knox was legitimately discharged for excessive absenteeism and that Knox cannot show that the reason for her discharge was pretextual or that her disability was another motivating factor in her discharge.

An actual disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A). An impairment that "substantially limits a major life activity" is one which "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). Major life activities may include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3.

The City does not dispute, of course, that Knox has a physical impairment because of her mydriasis and cataract.[8] Rather, the City contends that Knox cannot show that her impairment substantially limits at least one major life activity.

Because of her eye impairment, exposure to bright light also causes Knox to suffer severe headaches. She argues that, "[i]f one is unable to see well enough to drive or to function due to constant glare which creates severe headaches, then that condition should satisfy the test [of substantial limitation on a major life activity]." She also argues that "[t]he eye injury adversely affected her personal life as well."[9] Finally, although not argued in her legal analysis, Knox pointed out that the cataract on her left eye has caused her to need corrective lenses for the first time.

As the City argues, there are potentially two major life activities affected by Knox's impairment, seeing and working.[10] With regard to the first activity, seeing, Knox is able to see

---

[8]Knox has stated that, prior to her discharge, she suffered severe headaches and high blood pressure and that, following her discharge, she has suffered depression. However, Knox admits that the only impairment which she contends is "substantially limiting" and forms the basis of her ADA claim is her permanently dilated left pupil. [Doc. No. 45-2, ¶ 20; Doc. No. 62, ¶ 20].

[9]Knox does not elaborate on this statement, but the Court assumes, based on prior testimony, that she refers to the limitation on her ability to spend time outdoors in bright sunlight.

[10]The Court notes that the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (2008), substantially changes how employers and courts are to evaluate ADA claims. Congress has expanded the class of major life activities to specifically include, among others, seeing and working. *Id.* at § 3(2)(A). Congress rejected the reasoning of the Supreme Court in *Sutton v. United Airlines*, 527 U.S. 472, 489 (1999), so that the "determination of whether an impairment substantially limits a major life activity shall [now] be made without regard to the ameliorative effects of mitigating measures such as . . . medication." Pub.L. No. 110-325, § 3(4)(E)(i). Congress also rejected the Supreme Court's instruction to interpret the ADA's terms strictly, *see Toyota*, 534 U.S. at 196, stating that "[t]he definition of disability . . . shall be

9

with almost perfect visual acuity with her corrective lenses, has no injury to her right eye, and has continued to function at work and at home with her impairment. After the accident, Knox worked for some time as a driver for the City. When she was moved to an inside position as a clerk, she never requested any accommodation. Prior to her discharge, she held a second job as an afternoon and nighttime driver for the The Senior Citizen Center. In 2006, Knox passed a vision test and currently maintains a driver's license with CDL and tanker's endorsements. While the Court does not discount Knox's testimony and evidence that bright lights, even when filtered through sunglasses, continue to cause her headaches, this evidence is not sufficient under the applicable law to find that she is substantially limited in the major life activity of seeing. *See Watson v. Texas Youth Comm'n*, 269 Fed. App'x. 498 (5th Cir. 2008) (Under the Rehabilitation Act,[11] a plaintiff who developed traumatic mydriasis and photophobia, causing his vision to be extremely sensitive to sunlight and intense indoor lighting, was not substantially limited in the

---

construed in favor of broad coverage of individuals under this Act." Pub.L. No. 110-325, § 4(4)(A).

Nevertheless, the amendments to the ADA are not effective until January 9, 2009, and the Court must use the laws and interpretations of those laws in effect at the time of the complained-of actions. *See Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994); *see also Kiesewetter v. Caterpillar, Inc.*, No. 08-2140, 2008 WL 4523595, at *1 (7th Cir. Oct. 9, 2008) (citing same).

[11]The Rehabilitation Act protects an "otherwise qualified individual with a disability in the United States . . . [from] discrimination under any program or activity receiving Federal financial assistance . . . or activity conducted by the United States Postal Service." 29 U.S.C. § 794(d). The Rehabilitation Act adopts the standards applied under Title I of the ADA to determine whether there has been a violation. 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the [ADA] (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the [ADA] (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment.").

major life activity of seeing and thus was not disabled.); *Still v. Freeport McMoran, Inc.*, 120 F.3d 50, 52 (5th Cir. 1997) (Under the ADA, a plaintiff who was blind in one eye was not substantially limited in the major life activity of seeing, despite impaired peripheral vision, when his remaining eye functioned normally and he was able to perform "normal daily activities," such as driving cars and motorcycles and shooting.); *see also Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir. 1993) (plaintiff with vision corrected to 20/60 was not substantially limited in a major life activity under the Rehabilitation Act) .

With regard to the second activity, working, Knox has also failed to show that she is substantially limited. Not only did she work as a clerk for the City for three years following the accident, but she also obtained a second job as an afternoon and nighttime driver for the Senior Citizen Center. She continued to drive for the Senior Citizen Center until the position ended in July 2006, more than four years after the accident. The City's expert, Dr. Bernard Patty, reviewed Knox's medical and employment records and opined, to a reasonable degree of medical certainty, that Knox's eye impairment "would not prevent her from working as a truck driver or performing any type of work indoors." While "glare may cause discomfort, her symptoms would not be severe enough to prevent her from working satisfactorily in a variety of environments including driving in a commercial capacity and performing indoor work as a clerk." [Doc. No. 45, Exh. G, pp. 1-3].

Although Knox points out that Dr. Patty never personally examined her, she has provided no medical evidence that contradicts his findings. Her own treating opthamologist, Dr. Perry-Arnold, has not examined her since May 29, 2003, and did not know that, after the accident, she worked as a driver.

11

The Court has accepted Knox's testimony that she suffers headaches as a result of the glare from bright lights, but she must do more than show that she is "precluded from more than one type of job, a specialized job, or a particular job of choice"; rather, she must show that her impairment substantially limits "employment generally." *Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999). Even if Knox's headaches resulting from her mydriasis prevents her from performing the job of driver during bright daylight hours, she has failed to show that she is precluded from working as a driver during other hours[12] or that she is precluded from performing other jobs, including that of a clerk.

Accordingly, the City's Motion for Partial Summary Judgment on Knox's claim of actual disability is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 2. Record of Disability

In order to establish a claim based on a record of disability, a plaintiff must show that, at some point, she was actually disabled, i.e., that is that she had a physical impairment that substantially limited a major life activity. *See Hinojosa v. Jostens Inc.*, 128 Fed. App'x. 364, 367 (5th Cir. 2005); *see also id.* at 367 n.2 ("This court has specifically rejected that injury, surgery, hospitalization, and inability to work can establish a record of a disability as a matter of law. . . In addition, restrictions indicating an inability to perform continuous, heavy lifting or an inability to perform a particular job do not necessarily constitute a record of disability. . . This court requires a record of an impairment that substantially limits a major life activity.").

---

[12]Given Knox's four years of driving in the afternoon, even this restriction is questionable. However, the Court assumes that Knox could tolerate afternoon driving because it was of short duration (between 4 and 5:30 P.M.), whereas her City driving job required a full day of driving in the sun.

In this case, Knox relies only on the impairment to her eye. The fact that she took short-term disability leave for unrelated conditions both before and after her accident is no evidence that she had a record of disability related to her mydriasis and cataract.[13] In fact, even if she had taken disability leave because of her eye, as Knox admits, she is not entitled to the protection of the ADA unless she links her record of impairment to a limitation on a major life activity. The Court has determined that the impairment to Knox's eye does not substantially limit her in a major life activity and, thus, is not an "actual" disability under the ADA. Likewise, Knox cannot meet her prima facie burden of showing that she has a record of disability based on this impairment.

The City's Motion for Partial Summary Judgment on Knox's ADA claim based on a record of disability is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 3. "Regarded As" Disabled

Finally, even if Knox is not actually disabled, she may prevail if she can show that the City "regarded her" as disabled and terminated her on the basis of this perceived disability. To prevail on a regarded as claim of disability discrimination, it is not enough that the employer regarded an employee as physically impaired, a plaintiff must also show either that the employer (1) "mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) . . . mistakenly believes that an actual, nonlimiting impairment

---

[13]Counsel's statement that Knox "was placed on disability by the City of Monroe many times due to her eye injury" is not supported by the documentation he cites. The City has produced evidence that Knox took temporary disability leaves on five different occasions and then returned to full duty. [Doc. No. 73, pp. 3-4, Exhs. H & J]. Knox took a disability leave in 2000, prior to her eye injury, for a partial hysterectomy and disability leaves in the years following her eye injury for a surgery to remove her sweat glands, a gastrointestinal disorder, and hemorrhoid surgery.

substantially limits one or more major life activities." *Sutton,* 527 U.S. at 489; *see also Hinojosa v. Jostens Inc.*, 128 Fed. App'x. 364, 367 (5th Cir. 2005) (citing same).

Again, there is no dispute that Knox has an impairment to her left eye. However, Knox must also show that the City believed that Knox's impairment substantially limited her in a major life activity. Knox has failed to produce evidence sufficient to raise a genuine issue of material fact for trial.

Following the accident, Knox returned to work as a driver. The City only moved her to a clerk position at her own request.[14] By the time Hopkins became her supervisor, Knox had been employed by the City as a clerk for two years. Knox has produced no evidence that Hopkins believed that or treated her as if she had a substantially limiting impairment. Knox admitted that Hopkins never questioned her ability to perform her job as a clerk, wanted her to perform the job, and encouraged her in the job. If the jury were to believe Hopkins's testimony, he did not even know that Knox had an eye impairment. If the jury were to believe Knox's witness, former co-worker, White, Hopkins knew about the accident, thought Knox was "faking"[15] her impairment, and, thus, did not believe that she was substantially limited in any major life activity. In either

---

[14]Although not argued in her memorandum, in her affidavit, Knox suggests that she was regarded as disabled by the City because of an incident in 2003. At that time, her supervisor, Spatafora, asked her to find out if she could drive with sunglasses and that, if she could not, the City would make her take disability. Even if Spatafora regarded her as disabled, however, the City took no employment action against her. Knox admits that she spoke with City attorney, Nanci Summersgill, who intervened, and she was formally assigned to the clerk position. Her complaint in this matter is not about the 2003 incident, but her 2005 termination by Hopkins.

[15]Hopkins denies that he knew of Knox's eye injury prior to discharging her. At the summary judgment stage, however, the Court accepts Knox's properly supported "facts" as true.

case, Knox has failed to establish sufficient evidence to support a prima facie case on her regarded as claim.

The City's Motion for Partial Summary Judgment on Knox's regarded as claim under the ADA is also GRANTED, and this claim is DISMISSED WITH PREJUDICE.[16]

## III. CONCLUSION

For the foregoing reasons, the City's Motion for Partial Summary Judgment [Doc. No. 45] is GRANTED, and Knox's ADA claims are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 9th day of December, 2008.

*Robert G. James*
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

---

[16]Given the Court's conclusion that Knox cannot show that she is disabled, the Court need not reach the City's additional arguments.