# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **PEGGY SUE KNOX** | **CIVIL ACTION NO. 07-606** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **CITY OF MONROE AND DON HOPKINS** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

This is an employment discrimination action brought by Plaintiff Peggy Sue Knox ("Knox") against her former employer, City of Monroe ("the City"), and her former supervisor, Don Hopkins ("Hopkins"). Among other claims, Knox alleges that the City and Hopkins, in his individual capacity, are liable for her discharge under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654.[1]

Defendants have filed a Motion for Partial Summary Judgment [Doc. No. 53], which is opposed by Knox. For the following reasons, Defendants' Motion for Partial Summary Judgment is GRANTED.

## I. RELEVANT FACTS

On September 25, 1998, Knox[2] applied to work for the City as a full-time sanitation driver. The City employs more than fifty employees and is a covered employer under the

---

[1] Also pending before the Court is Defendants' motion for summary judgment on Knox's claim under 42 U.S.C. §§ 1981 and 1983. The Court will address that motion in a separate ruling.

[2] At the time, Knox was known as Peggy Copeland. For consistency, however, the Court will refer to her by the name under which she filed her Complaint, Knox.

FMLA.

On or about November 11, 1998,[3] Knox began her employment with the City as a truck driver in the Sanitation Department, a division of the Public Works Department.

On May 1, 2000, and June 24, 2001, while under the supervision of Don Spatafora ("Spatafora") Knox received written warnings about excessive absenteeism, both of which stated that she would be suspended if the absenteeism continued.

On or about September 3, 2002, Knox sustained a work-related injury to her left eye, causing a permanent partial dilation and a mild cataract. Following her treatment, Knox was released to drive. Upon her return, however, Knox began suffering from light-induced headaches. She then obtained a note from her physician stating that she was restricted from working in the sunlight[4] and requested a transfer to an inside position. Some time around the end of September 2002, Knox began working as a clerk in the Sanitation Department.

On March 23, 2004, Spatafora issued Knox another written warning about excessive absenteeism.

In October 2004, Hopkins, who was previously employed by the City as the Recreation Center Supervisor, became the Sanitation Supervisor. When he came into the position, he found that the department had a problem with excessive absenteeism. Hopkins reviewed the Sanitation Department attendance records and created a list of approximately 51 employees, including

---

[3] In her affidavit, Knox states that she began her employment on November 9, 1998, but she admitted the accuracy of the City's statement that she began employment on November 11, 1998. [Doc. Nos. 53, Attach. #2; 64, Attach. #2, ¶ 2 and Exh. A, ¶ 4]. The specific date is not material, however.

[4] Knox's opthamologist, Dr. Priscilla Perry-Arnold, has no copy of such a note in her medical record, but Knox recalls providing the note to the City.

Knox, who had excessive absences.

On October 25, 2004, Hopkins circulated and posted the list of employees with excessive absences. On the same day, Hopkins also issued a written warning to Knox about her excessive absenteeism.

Hopkins "believed that some employees were abusing the sick leave . . . by calling in sick without actually being sick and then simply going to a doctor to obtain a note, even when they did not have any sick or other paid or unpaid time available to use." [Doc. No. 53, Exh. C, ¶ 5]. For that reason, he considered the polices contained in the City Employee Handbook ("Handbook") and the collective bargaining agreement ("the CBA") between the City and local union and instituted a new, more restrictive absenteeism policy for Sanitation Department employees. Under Hopkins's new policy, any employee with less than 40 hours of accrued sick leave was considered excessively absent and subject to discipline for calling in sick, even if he or she obtained a doctor's excuse. Employees who were on or who requested protected leave, such as FMLA, were excepted from the absenteeism policy. Knox contends that Hopkins never informed her of nor posted the new absenteeism policy.

Other than the issue of absenteeism, Hopkins and Knox had a satisfactory working relationship. Knox, who was seated at the front of the office, handled customer complaints, clerical duties, and also served as a receptionist for the Sanitation Department. Hopkins was satisfied with Knox's job performance when she was present, but, if Knox was absent, Hopkins had to assign other employees to cover her duties, as well as their own.

By the end of 2004, Knox had exhausted her 96 accrued hours of sick leave caring for her

children and her mother,[5] as well as addressing her own health problems.

In November 2004, Knox was treated by Dr. Steven McMahan for severe headaches.[6] She attests that her headaches were so severe that she vomited every time she sat up. Originally, Dr. McMahan's nurse practitioner thought she might have a clogged artery and sent her for a CAT scan and ultrasound. When Knox returned for the results of the CAT scan and ultrasound, the nurse practitioner found Knox had high blood pressure, which can cause severe headaches.

Dr. McMahan prescribed Knox medication to lower her blood pressure, but he told her that it would take approximately two (2) weeks for the medication to reach a level sufficient to stop her headaches. The hypertension medication then caused Knox's blood pressure to drop too low, so that she felt too weak to "function or get out of bed," resulting in additional absences from work until the medication could be adjusted.

In late December 2004 or early January 2005, Knox had a conversation with Hopkins, explaining that she had "health issues and that [she] was going to [a] doctor," who was "trying to get it straightened out." [Doc. No. 53, Exh. A, pp. 103, 105].

In January 2005, despite not having accrued sick leave, Knox was absent ten (10) days without pay. While Knox provided doctor's excuses for her absences, the excuses did not state the nature of her illness or condition, only that she was unable to work on the dates indicated. [Doc. No. 53, Exh. A, p. 127].

In late January 2005, Hopkins and Knox again spoke about her absences. Hopkins

---

[5] Knox is a single parent, and she attests that her children had health problems in 2004. Her mother died in April of 2004 and was sick prior to her death. [Doc. No. 64, Exh. A, ¶ 20].

[6] Dr. McMahan was Knox's family doctor and also treated her before and after this time for other maladies, none of which are serious health conditions under the FMLA.

4

recalls that Knox told him that she had "high blood pressure" and that she had been taking time off to go to her doctor. Hopkins offered Knox the opportunity to apply for leave under the FMLA if she needed to do so. Knox was still unsure whether she might have a blockage in her neck. She told Hopkins that she did not want to take FMLA leave at that time, but had an angiogram scheduled. If the results of the angiogram indicated that she needed surgery for the blockage, she would apply for FMLA leave at that time.

According to Hopkins, he offered FMLA leave to Knox and similarly situated employees to assist the employees and to allow him to fill a position temporarily. He testified that he specifically told Knox: "if you miss any more days, I'm going to let you go." [Doc. No. 53, Exh. B, p. 74]. Knox denies that Hopkins warned her that she was facing discharge or that she could protect her job by taking the FMLA leave.

A short time later, on January 27, 2005, Knox called into work at 6:30 A.M. to say that she would be absent. Knox had a "serious headache" that day, but during her deposition, Knox could not recall whether she saw Dr. McMahan or another doctor. In contrast, in her affidavit in opposition to this Motion for Partial Summary Judgment, Knox attests that she "went to Dr. McMahan's office on January the 27th of 2005." [Doc. No. 64, Exh. A, ¶ 27]. Knox could not recall if she needed to be off from work the entire day[7] or if she could have returned to work that day.

---

[7]Attached to Knox's deposition is an excuse from Dr. Keith White, a cardiovascular and thoracic surgeon that states "[t]his pt was in Dr. Keith White's office on the above date. Please excuse from any work missed. . . ." [Doc. No. 53, Exh. A, Attch.]. The date listed is either January 24 or January 27, 2005. However, Knox could not recall the doctor or doctors she saw on January 27, 2005. If Knox saw Dr. White on that date, she could not recall the purpose of the examination, and Dr. White's note does not provide any information either.

When Knox did return to work, on January 28, 2005, she had a doctor's excuse for her absence and an appointment card for an angiogram, which was scheduled for February 2, 2005. As she had in the past, Knox gave the excuse and appointment card to Joan Benton ("Benton"), the payroll clerk for the Sanitation Department. It is not clear if Benton gave the excuse and appointment card to Hopkins or told him that Knox had provided an excuse. It was Benton's normal practice to place the excuse in the employee's personnel file and to tell the supervisor.[8]

Benton told Knox that Hopkins wanted to see her. Hopkins fired Knox that day, effective the previous day, January 27, 2005, for the stated reason of her excessive absenteeism. Although she had received written warnings about her absences, she had not been suspended prior to her discharge.

Hopkins's termination decisions are subject to review by the Public Works Director Tom Janway[9] ("Janway") and then by the Human Resources Department and the Mayor's Office. On February 1, 2005, Knox wrote a grievance letter to Janway, which was received on February 2, 2005. In the letter, Knox stated that she believed her termination was wrongful because Hopkins "was fully aware of my being under a Doctors [sic] care and I have consistently provided a Doctor's excuse with each absence." [Doc. No. 53, Exh. A, Depo. of Knox, Attch. 19]. She further stated that she had a meeting with Hopkins prior to her termination in which she related that she was

> having some health issues and that I have been diagnosed with high blood

---

[8]In a statement to the Louisiana Department of Labor, Annette Bradford of the Human Resources Department stated that Knox had not provided a doctor's excuse for her absence.

[9]Janway has sometimes been incorrectly referred to in the pleadings as "Tom Jamway," but the Court will use his correct name.

> pressure and that this was causing severe headaches that made it impossible for me to function. He at this time offered to give me a leave of absence but as I explained to him, I wanted to wait until I found out if I would require surgery for any arterial blockage that may be found. That if it did require surgery I would need to take a leave at that time. . . I am now scheduled for an angiogram that should decide if I will need surgery.

[Doc. No. 63, Exh. A, Depo. of Knox, Attch. 19]. Although Knox later had a meeting with Janway, he allowed Hopkins's termination decision to stand. The Mayor also allowed the termination to stand.

Knox was replaced by Estella Warbington, who had worked with Hopkins at the Recreation Center. Knox "believes Hopkins wanted to terminate [her] to make a position for [Warbington]." [Doc. No. 64, Exh. A, ¶ 18].

Following her discharge, Knox was able to control her hypertension with an adjustment to her medication. She was never hospitalized and never underwent surgery.

On April 3, 2007, Knox filed this lawsuit. At that time, she did not assert a claim under the FMLA. However, on January 29, 2008, with leave of Court, Knox filed an Amended Complaint [Doc. No. 26]. In her Amended Complaint, Knox asserts a claim under the FMLA, stating as follows:

> [The City] by its conduct . . . did deprive the plaintiff of . . . her right to be free from willful violations of the [FMLA] when she was discharged and Hopkins interfered with her rights under the [FMLA]. At the time of her discharge, Plaintiff was suffering from a serious medical condition: high blood pressure and severe stress headaches. She was scheduled also for an in-patient examination at the hospital for a possible heart condition at the time of her discharge. She expressed a desire to take FMLA in the event of surgery or other long absence for medical reasons. Plaintiff was at the time of her discharge entitled to take vacation and to take FMLA. She expressed a desire to take FMLA if required.

[Doc. No. 26, ¶ 16].

7

## II. LAW AND ANALYSIS

### A. Standard of Review

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B. FMLA

The FMLA entitles eligible employees to 12 work-weeks of leave in any 12-month period for various qualifying events, including a "health condition that makes the employee unable to perform the functions" of her position.[10] 29 U.S.C. § 2612(a)(1)(D). The FMLA "protects employees from interference with their leave as well as against discrimination or retaliation for exercising their rights." *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998); *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008)

---

[10]It is undisputed that the City is a covered employer under FMLA, and Knox was an employee eligible to take FMLA leave if she qualified.

("The FMLA has two distinct sets of provisions": the prescriptive provisions, which "create a series of substantive rights, namely, the right to take up to twelve weeks of unpaid leave," and the proscriptive rights that "bar employers from penalizing employees and other individuals for exercising their rights.") (citations and internal quotation marks omitted). An employer's interference with an employee's entitled leave gives rise to a claim under 29 U.S.C. § 2615(a)(1), while an employer's prohibited discrimination or retaliation gives rise to a claim under 29 U.S.C. § 2615(a)(2). *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004).

In this case, Knox argues that she has asserted both an interference and a retaliation claim against the City.

### 1. Interference Claim under the FMLA

Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any [FMLA leave] right." 29 U.S.C. § 2615(a). To prevail on a FMLA claim, Knox must prove: (1) she was an eligible employee; (2) the City interfered with her rights under the FMLA; and (3) she was prejudiced by the interference. *Kirk v. Reed Tool Co.*, 247 Fed. App'x. 485, 486 (5th Cir. 2007) (citing 29 U.S.C. §§ 2615, 2617(a)(1)).

The City moves for summary judgment on the bases that (1) Knox did not suffer from a serious health condition (and thus was not protected under FMLA); (2) she declined an offer of FMLA leave; and (3) the City properly discharged her for excessive absenteeism.

Knox responds that the evidence is sufficient to show that her severe headaches,[11] high blood pressure, and potential blockage or heart condition constituted a serious health condition

---

[11]Counsel refers to Knox's severe headaches as "migraine headaches," but she never described her headaches as migraines.

which required continuing treatment by a health care provider. Although she was an eligible employee under FMLA, Knox complains that Hopkins never warned her that she was facing discharge unless she took FMLA leave, never informed her that intermittent FMLA leave is available, and anticipatorily discharged her to prevent her from using FMLA leave.

The Court finds that Knox has failed to raise a genuine issue of material fact that the City's actions interfered with or restrained her attempted exercise of her entitlement to take FMLA leave. Knox admits that Hopkins offered her FMLA leave in late January 2005, a few days before her discharge. *See* [Doc. No. 64, Exh. A, ¶ 15 ("At this meeting, Hopkins told KNOX that SHE could take FMLA.")]; [Doc. No. 53, Exh. A, p. 103 (Hopkins "mentioned" FMLA)]. Knox also admits that she told Hopkins that she did not want to take FMLA leave, but she would <u>if she needed to have surgery</u>. *See* [Doc. No. 53, Exh. A, p. 103 ("And I had explained to him that I would rather wait until all the test results were in to see if I was going to have to have surgery before I took the medical family leave.")]; [Doc. No. 64, Exh. A, ¶ ("KNOX told Hopkins that SHE wanted to wait to see if SHE would require surgery. SHE told Hopkins that she would use the FMLA if that were needed.")]. There is no evidence that, prior to her discharge, Knox requested FMLA leave, attempted to take FMLA leave, told Hopkins she needed surgery, or placed him on notice otherwise that she was exercising or attempting to exercise her rights under the FMLA.

Further, Knox cannot state an interference claim because Hopkins failed to provide her with individual notice of the possibility of intermittent leave under the FMLA. First, Knox's statements to Hopkins did not place the City on notice of her need for intermittent leave. Knox specifically testified that she did not want to take unpaid FMLA leave unless she had surgery and

10

had to be off from work for a longer period of time.[12] *See* 29 C.F.R. § 825.301(b)-(c) (Employer must give employee individual information on FMLA leave if the employee gives notice of the need for FMLA leave.) Even on the day before her discharge, it is unclear that Knox needed intermittent leave. At her deposition, Knox could not recall the purpose of her doctor's visit, finally indicating that the visit was related to her severe headaches. She also could not recall whether she was unable to perform her job on January 27, 2005, or whether she simply failed to return to work after she left her doctor's appointment. Finally, the doctor's notes Knox presented to the City for all of her absences stated only that she had been treated by the physician on a certain date or should be excused for a certain day or days, without any explanation as to her condition or her ability to perform her job. Second, Hopkins fulfilled any duty he had by offering Knox the opportunity to apply for FMLA leave. Knox was aware that Hopkins is neither a human resources manager nor a benefits specialist. She was aware that the City has a FMLA policy and that the policy is contained in the Handbook. If she wished to take FMLA leave, Knox could have reviewed the policy and discussed her options with the human resources department. Knox was also aware that the City has its own legal department and had personally consulted with the City's attorney in the past when she had a concern. Under the undisputed facts of this case, Hopkins's failure to inform Knox individually about intermittent leave does not rise to the level of an interference claim under the FMLA.

Finally, the crux of Knox's argument is that Hopkins interfered with her entitlement to FMLA leave because he allegedly failed to warn her that she would be fired for excessive

---

[12]Even then, Knox was aware of the City's disability policy, having taken disability leave previously, and has indicated that she would have sought paid leave under it.

absenteeism if she did not protect herself by requesting FMLA leave.[13]  This argument also fails

as a matter of law.  As the Fifth Circuit has cautioned,

> It is well to remember that the FMLA is designed only to protect employees when there is a "serious health condition," and only in a manner that "accommodates the legitimate interests of employers." 29 U.S.C. § 2601(a)(4), (b)(3). Requiring an employer to undertake to investigate whether FMLA-leave is appropriate each time an employee, who has been absent without excuse three times in the preceding three weeks, informs the employer that she will not be at work "that day" because she is "having a lot of pain in her side" or is "sick," is quite inconsistent with the purposes of the FMLA, because it is not necessary for the protection of employees who suffer from "serious health conditions," and would be unduly burdensome for employers, to say the least. *See Price v. City of Fort Wayne*, 117 F.3d 1022, 1023 (7th Cir.1997) ("The goal [of the FMLA] was not to supplant employer-established sick leave and personal leave policies, but to provide leave for more uncommon and, presumably, time-consuming events such as having or adopting a child or suffering from what is termed a 'serious health condition.'").

*Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980 (5th Cir. 1998).

In this case, it is undisputed that Hopkins warned Knox of her excessive absences in October 2004 and, after her continued absences in the next three months, then offered her leave under the FMLA if she needed it.  Hopkins had no duty under the FMLA to threaten Knox with discharge, so that she could preemptively claim FMLA protection.  Likewise, the City is not liable for interference under FMLA because of Hopkins's alleged failure to warn Knox of her impending discharge.

The City's Motion for Partial Summary Judgment on Knox's FMLA interference claim is

---

[13] Hopkins says that he did warn Knox that he would have to "let her go" if she had additional absences, but, for purposes of summary judgment, the Court must resolve all credibility determinations in favor of the non-movant, Knox.

GRANTED.[14]

## 2. Retaliation Claim under the FMLA

In its memorandum in support of its Motion for Partial Summary Judgment, the City argued that Knox had attempted to state only an interference claim and moved for summary judgment on that claim. However, in her opposition, Knox contends that she has stated a claim against the City both for interference and for retaliation. Accordingly, in its reply memorandum [Doc. No. 69], the City argues that it is also entitled to summary judgment on any retaliation claim asserted by Knox under the FMLA because "'retaliation' . . . is a legal and semantic impossibility," when she had never requested nor taken FMLA leave.

To establish a prima facie case of retaliatory discharge under the FMLA, a plaintiff must demonstrate that (1) she engaged in a protected activity, (2) the employer discharged her, and (3) there is a causal link between the protected activity and the discharge. *Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 332 (5th Cir. 2005) (citing *Hunt v. Rapides Healthcare Sys., Inc.*, 277 F.3d 757, 768 (5th Cir. 2001)); *cf. Comeaux-Bisor v. YMCA of Greater Houston*, 290 Fed. App'x. 722, 724-25 (5th Cir. 2008) ("To establish a prima facie case for discrimination or retaliation under the FMLA, a plaintiff must demonstrate that she is protected under the FMLA; she suffered an adverse employment decision; and that she was treated less favorably than an employee who had not requested leave under the FMLA or that the adverse decision was made because of her request for leave.") (citing *Bocalbos v. Nat'l Western Life Ins. Co.*, 162 F.3d 379, 384 (5th Cir.1998)). If the plaintiff succeeds in establishing a prima facie case, the burden

---

[14]Having determined that Knox has failed to state a claim of interference, the Court need not reach the issue of whether Knox suffered a serious health condition at the time of her termination.

shifts to the employer to provide a legitimate, non-retaliatory reason for the termination. 434 F.3d at 332. If the employer articulates such a reason, the plaintiff must show by a preponderance of the evidence that the employer's reason is a pretext for retaliation. *Id.* at 332-33.

In this case, Knox can establish the second element, that she was discharged. However, she must also establish the two other elements of her prima facie case.

With regard to her protected activity, Knox argues that the "discussion of her taking Leave in the near future" is sufficient. [Doc. No. 64, p. 11]. The Court disagrees. Counsel's characterization of the discussion between Knox and Hopkins is inaccurate, even when viewed in the light most favorable to Knox. According to Knox, she told Hopkins that she would not take FMLA leave for the hypertension and severe headaches she suffered, but would apply for FMLA leave if she had to have surgery for a possible blockage in an artery in her neck. She did not request, attempt to request, or give notice of her intent to apply for FMLA leave any time prior to her termination on January 28, 2005. Even after her termination, when she contacted Janway with her grievance, Knox again admitted that she had been offered FMLA leave, but she declined leave for the conditions for which she was receiving treatment at the time of her discharge. Under either test applied by the Fifth Circuit, Knox did not engage in protected activity and was not protected by FMLA when she declined the City's offer of leave, but expressed some possible interest in taking leave in the future if she needed medical treatment for a blockage (which never occurred).

Under these circumstances, Knox also fails to establish a prima facie case of retaliation, and the City's Motion for Partial Summary Judgment on this claim is also GRANTED.

### 3. Timeliness of Knox's FMLA Claims

In its Reply, the City argues, for the first time, that Knox's FMLA claims are untimely because they were brought more than two years after her discharge. The City argues that she is not entitled to application of the three-year statute of limitations because she has failed to show that the City willfully violated her rights.

The Court will not consider the City's timeliness arguments. Although the City's arguments may have merit, given the nature of Knox's claims, the Court cannot rely on an argument presented for the first time in a reply memorandum and to which the opposing party had no opportunity to respond.

## III. CONCLUSION

For the foregoing reasons, the City's Motion for Partial Summary Judgment [Doc. No. 53] is GRANTED, and Knox's FMLA claims are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 8th day of January, 2009.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE