# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| **PEGGY SUE KNOX** | **CIVIL ACTION NO. 07-606** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **CITY OF MONROE AND DON HOPKINS** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

This is an employment discrimination action brought by Plaintiff Peggy Sue Knox ("Knox") against her former employer, City of Monroe ("the City"), and her former supervisor, Don Hopkins ("Hopkins"). Among other claims, Knox alleges that the City discharged her because of her race (white) in violation of 42 U.S.C. §§ 1981 and 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* She also contends that Hopkins is individually liable for race discrimination in violation of §§ 1981 and 1983.

Defendants have filed a Motion for Partial Summary Judgment [Doc. No. 57], which is opposed by Knox [Doc. No. 64]. For the following reasons, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I.     RELEVANT FACTS

On September 25, 1998, Knox[1] applied to work for the City as a full-time driver in the Sanitation Department.

---

[1]At the time, Knox was known as Peggy Copeland. For consistency, however, the Court will refer to her by the name under which she filed her Complaint, Knox.

On or about November 11, 1998,[2] Knox began her employment with the City as a truck driver in the Sanitation Department, a division of the Public Works Department.

On May 1, 2000, and June 24, 2001, while under the supervision of Don Spatafora ("Spatafora"), who is white, Knox received two written warnings about excessive absenteeism. Both warnings stated that she would be suspended if the absenteeism continued.

On or about September 3, 2002, Knox sustained a work-related injury to her left eye, causing a permanent partial dilation and a mild cataract.  Following her treatment, Knox was released to drive.  Upon her return, however, Knox began suffering from light-induced headaches.  She then obtained a note from her physician stating that she was restricted from working in the sunlight[3] and requested a transfer to an inside position.  Some time around the end of September 2002, Knox began working as a clerk in the Sanitation Department.

On March 23, 2004, Knox received another written warning about excessive absenteeism, which stated that she had to "submit a doctor[']s excuse for each day you are off sick."  The warning further stated that "**If this continues you will be suspended.  After that you will be terminated . . .**." [Doc. No. 57, Exh. A, Nos. 11, 12, 13, and 14].

In October 2004, Hopkins, who is black, became the Sanitation Supervisor.  Hopkins had been employed by the City since 1999 and had most recently served as the Recreation Center Supervisor.

---

[2]In her affidavit, Knox states that she began her employment on November 9, 1998, but she admitted the accuracy of the City's statement that she began employment on November 11, 1998. [Doc. Nos. 57, Attach. #1; 63, Attach. #1, ¶ 2 and Exh. A, ¶ 4].  The specific date is not material, however.

[3]Knox's opthamologist, Dr. Priscilla Perry-Arnold, has no copy of such a note in her medical record, but Knox recalls providing the note to the City.

When Hopkins came into the Sanitation Supervisor position, he found that the department had a problem with excessive absenteeism.[4]  Hopkins reviewed the Sanitation Department attendance records and created a list of approximately 51 employees, including Knox, who had excessive absences.

On October 25, 2004, Hopkins circulated and posted the list of employees with excessive absences.  On the same day, Hopkins also issued a written warning to Knox about her excessive absenteeism.  The warning stated as follows:

> Regarding your excessive absenteeism, for each day you are absent from work, you must submit proper doctor's certification.  If you cannot provide a doctor's certificate upon your return, you will be suspended for one week; if you continue not to bring in an excuse you will be terminated.  This is in accordance with the AFL-CIO, Local #2388 union contract Article IX, Section 4.  If you have any questions regarding this, please contact me at extension 2263.

[Doc. No. 57, Exh. A, #14 (attachment to deposition of Knox)].

Hopkins "believed that some employees were abusing the sick leave . . . by calling in sick without actually being sick and then simply going to a doctor to obtain a note, even when they did not have any sick or other paid or unpaid time available to use." [Doc. No. 57, Exh. G, ¶ 5].  Hopkins was aware of the polices contained in the City Employee Handbook ("Handbook") and the collective bargaining agreement ("the CBA") between the City and local union, but instituted a new, more restrictive absenteeism policy for Sanitation Department employees.  Under Hopkins's new policy, any employee with less than 40 hours of accrued sick leave was considered excessively absent and subject to discipline for calling in sick, even if he or she obtained a doctor's excuse.  Employees who were on or who requested protected leave, such as

---

[4]Although Knox makes much of the fact that Hopkins's true concern was for employees to get along, it is not disputed that absenteeism was a problem for the department.

FMLA, were excepted from the absenteeism policy. Knox contends that Hopkins never informed her of nor posted the new absenteeism policy.

The City's attendance/sick leave policies in the Handbook and in the CBA were inconsistent with Hopkins's new policy. The Handbook states that employees are required to maintain a minimum of 12 hours of accrued sick leave. [Doc. No. 57, Exh. G-3]. All employees are expected to maintain regular attendance, and "[u]nsatisfactory attendance . . . may be cause for disciplinary action, including discharge." [Doc. No. 57, Exh. G-3]. In a chart of sample disciplinary actions, the City may discharge an employee for excessive absences if he or she has three absences without a doctor's excuse, but the chart does not contain specific provisions for a lesser number of absences or absences for which a doctor's excuse is provided. [Doc. No. 57, Exh. G-3]. The CBA states only that "[e]mployees with an unacceptable attendance record must support any sick leave with an appropriate certification or verification from a local physician." [Doc. No. 57, Exh. G-4]

Other than the issue of absenteeism, Hopkins and Knox had a satisfactory working relationship. Knox, who was seated at the front of the office, handled customer complaints, clerical duties, and also served as a receptionist for the Sanitation Department. Hopkins did not recall Knox arriving late to work or leaving early, nor did she take excessive breaks. Overall, Hopkins was satisfied with Knox's job performance when she was present, but, if Knox was absent, Hopkins had to assign other employees to cover her duties, as well as their own.

By the end of 2004, Knox had exhausted her 96 accrued hours of sick leave caring for her

children and her mother,[5] as well as addressing her own health problems.

In late December 2004 or early January 2005, Knox had a conversation with Hopkins, explaining that she had "health issues and that [she] was going to [a] doctor," who was "trying to get it straightened out." [Doc. No. 57, Exh. A, pp. 103, 105]. Knox was suffering from severe headaches, which her doctor, Dr. Steven McMahan, believed were caused by hypertension. He had placed her on medication for the hypertension to lower her blood pressure, which was also supposed to resolve her headaches.

In January 2005, despite not having accrued sick leave, Knox was absent ten (10) days without pay. Knox provided doctor's excuses for each of her absences. [Doc. No. 57, Exh. A, p. 127].

In late January 2005, Hopkins and Knox again spoke about her absences. Hopkins recalls that Knox told him that she had "high blood pressure" and that she had been taking time off to go to her doctor. Hopkins offered Knox the opportunity to apply for leave under the FMLA if she needed to do so. She told Hopkins that she did not want to take FMLA leave at that time, but had an angiogram scheduled to determine if she had a blockage in her neck. If the results of the angiogram indicated that she needed surgery, she told Hopkins she would apply for FMLA leave then.

According to Hopkins, he offered FMLA leave to Knox and similarly situated employees to assist the employees and to allow him to fill a position temporarily. He testified that he specifically told Knox: "if you miss any more days, I'm going to let you go." [Doc. No. 57, Exh.

---

[5]Knox is a single parent, and she attests that her children had health problems in 2004. Her mother died in April of 2004 and was sick prior to her death. [Doc. No. 64, Exh. A, ¶ 20].

B, p. 74]. Knox denies that Hopkins warned her that she was facing discharge or that she could protect her job by taking FMLA leave.

A short time later, on January 27, 2005, Knox called into work at 6:30 A.M. to say that she would be absent. Knox had a "serious headache" that day, but during her deposition, Knox could not recall whether she saw Dr. McMahan or another doctor. In contrast, in her affidavit in opposition to this Motion for Partial Summary Judgment, Knox attests that she "went to Dr. McMahan's office on January the 27th of 2005." [Doc. No. 64, Exh. A, ¶ 27]. Knox could not recall if she needed to be off from work the entire day or if she could have returned to work that day.

When Knox did return to work, on January 28, 2005, she had a doctor's excuse for her absence[6] and an appointment card for an angiogram, which was scheduled for February 2, 2005. As she had in the past, Knox gave the excuse and appointment card to Joan Benton ("Benton"), the payroll clerk for the Sanitation Department. Benton could not recall any employee who was absent, went to the doctor, and did not provide a doctor's excuse. It is not clear if Benton gave the excuse and appointment card to Hopkins or told him that Knox had provided an excuse. It was Benton's normal practice to place the excuse in the employee's personnel file and to tell the supervisor.

Benton told Knox that Hopkins wanted to see her. Hopkins fired Knox, effective the previous day, January 27, 2005, for the stated reason of her excessive absenteeism. Although she

---

[6]Attached to Knox's deposition is an excuse from Dr. Keith White, a cardiovascular and thoracic surgeon that states "[t]his pt was in Dr. Keith White's office on the above date. Please excuse from any work missed. . . ." [Doc. No. 57, Exh. A, Attach.]. The date listed is either January 24 or January 27, 2005.

had received written warnings about her absences, she had not been suspended prior to her discharge. At the time of her discharge, Knox had 65 hours of vacation time available.

Hopkins's termination decisions are subject to review by the Public Works Director Tom Janway ("Janway") and then by the Mayor. On February 1, 2005, Knox wrote a grievance letter to Janway, which was received on February 2, 2005. In the letter, Knox stated that she believed her termination was wrongful because Hopkins "was fully aware of my being under a Doctors [sic] care and I have consistently provided a Doctor's excuse with each absence." [Doc. No. 57, Exh. A, Knox Depo., Attach. 19]. She further stated that she had a meeting with Hopkins prior to her termination in which she related that she was

> having some health issues and that I have been diagnosed with high blood pressure and that this was causing severe headaches that made it impossible for me to function. He at this time offered to give me a leave of absence but as I explained to him, I wanted to wait until I found out if I would require surgery for any arterial blockage that may be found. That if it did require surgery I would need to take a leave at that time. . . I am now scheduled for an angiogram that should decide if I will need surgery.

[Doc. No. 63, Exh. A, Knox Depo., Attach. 19]. Although Knox later had a meeting with Janway and Hopkins, he allowed Hopkins's termination decision to stand. Janway testified in his deposition, however, that, if an employee is absent and has a doctor's excuse, it is an excused absence, and the employee is not supposed to be fired for that reason. [Doc. No. 63, Exh. B, Janway Depo., p. 11].

Knox did not request a meeting with the Mayor because she was told by his secretary that the Mayor would uphold her termination.[7] However, neither the Human Resources Department

---

[7]The statement of the Mayor's secretary is hearsay, but the Court has considered it, not for the truth of the statement, but only in the context of Knox's decision not to grieve her termination any further.

nor the Mayor took any independent action to reinstate Knox. In a statement to the Louisiana Department of Labor, Annette Bradford of the Human Resources Department wrote that Knox was terminated after she failed to provide a doctor's excuse for her absence.

In March 2005, Hopkins hired Estella Warbington ("Warbington") to replace Knox. Warbington, who is black, had worked for Hopkins when he was the Recreation Center Supervisor.

On April 3, 2007, Knox filed this lawsuit.

On October 30, 2007, Defendants filed a Motion for Partial Summary Judgment [Doc. No. 16], seeking dismissal of Knox's claim of race discrimination against Hopkins under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*("Title VII"), and dismissal of Knox's claims of race discrimination against both Hopkins and the City under 42 U.S.C. § 1981, and the Louisiana Employment Discrimination Law ("LEDL"), La. Rev. Stat. 23:301, *et seq.*[8] Defendants also moved for summary judgment on Knox's state law of negligent or intentional infliction of emotional distress.

After briefing was complete, on March 12, 2008, the Court granted in part and denied in part Defendants' Motion for Partial Summary Judgment. [Doc. Nos. 30 & 31]. The Court granted Defendants' Motion for Partial Summary Judgment on Knox's Title VII claim against Hopkins and her LEDL and other state law claims against Defendants and dismissed those claims with prejudice. However, the Court denied Defendants' Motion for Partial Summary Judgment on Knox's § 1981 claims. Instead, the Court granted Knox ten business days to amend her

---

[8] Knox also asserted claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.,* and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, but the Court has granted summary judgment to Defendants on those claims.

Complaint to properly assert § 1981 claims against Hopkins and the City through § 1983. The Court cautioned that it would dismiss Knox's claims if she failed to amend within this time.

On March 21, 2008, Knox timely filed a Second Amended Complaint [Doc. No. 33] in which she asserts claims of race discrimination under § 1981 against the City and against Hopkins in his individual and official capacities,[9] through § 1983. Knox alleged as follows:

> Around April 2004 as a result of personnel loss, HOPKINS became the public works superintendent.[10] HOPKINS made statements to the effect of replacing white clerical personnel with blacks. Around July 2004, a white clerical employee was moved from the front office to a rear dock. [Estella Warbington][11], a black female and personal friend of HOPKINS was brought in as secretary in the front office.

[Doc. No. 31, ¶ 6]. Knox further alleges that she was "treated less favorably than Blacks when Defendants fired her." [Doc. No. 31, ¶ 10]. Finally, Knox alleges that

> HOPKINS made the decision to discharge Plaintiff. He did so on the basis of race. He gave pretextual reasons for her discharge. Under city policy, so long as an employee has a medical excuse, she can not be fired for missing that day. HOPKINS discharged Plaintiff for this reason. However, HOPKINS also stated that he wished to replace Plaintiff with a black female and eventually did so. He is thus liable unto Plaintiff in his individual capacity in violation of 42 [U.S.C. §] 1981, made applicable through 42 [U.S.C. §] 1983.
>
> . . .
>
> CITY OF MONROE and HOPKINS in his official capacity are liable unto Plaintiff for the discharge . . . due to race because the CITY . . . delegated to HOPKINS the final decision and making [sic] authority for discharging

---

[9]As the Court has previously noted, a claim against Hopkins in his official capacity is a claim against the City.

[10]It is now undisputed that Hopkins became the Sanitation Supervisor, not the Public Works Superintendent and that he attained this new position in October 2004, not April 2004.

[11]The Amended Complaint incorrectly names Knox's replacement as "Stella Worbaton." The Court uses Warbington's correct name.

employees within his department.  Further, it was HOPKINS' decision as the final policy maker in sanitation to move whites away from the front office and replace white office workers with black personnel.  HOPKINS was the Superintendent of the Sanitation Department where Plaintiff worked.  CITY . . . and HOPKINS in their official capacities are liable unto Plaintiff for her discharge based upon her race under 42 [U.S.C. §] 1981, made applicable through 42 [U.S.C. §] 1983.

[Doc. No. 31, ¶¶ 11-12].

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact.  *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial.  *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  The nonmoving party must show more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B.    Race Discrimination

Knox seeks to hold the City liable under Title VII and § 1981 through § 1983[12] and to

---

[12]Knox has also asserted a § 1981 claim against Hopkins in his official capacity, but as the Court has noted, a claim against a municipal employee in his official capacity is a claim against the City and thus redundant.  Contrary to Defendants' statement in their memorandum,

hold Hopkins individually liable under § 1981 through § 1983.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981's protections against race discrimination "include[] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b); *see Felton v. Polles*, 315 F.3d 470, 483 (5th Cir. 2002) (citing 42 U.S.C. § 1981) (other citations omitted), abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 57 (2006). Despite its language, § 1981 prohibits racial discrimination against white persons, as well as persons of other races. *See McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 287-96 (1976).

Because Title VII, § 1981, and § 1983 are "parallel causes of action," courts apply the same analysis.[13] *Lauderdale v. Tex. Dep't of Crim. Justice, Inst'al Div.*, 512 F.3d 157, 166 (5th

---

however, the Court did not "hold" this claim uncognizable. Rather, the claims merge. Accordingly, the Court may refer to the claim against the City without reference to the claim against Hopkins in his official capacity each time.

[13]A plaintiff advancing a cause of action against a municipality under § 1983 for violation of the Equal Protection Clause must also demonstrate that the alleged deprivation was committed by a person acting under color of state law and that the deprivation was the result of municipal custom or policy. *See Leffall v. Dallas Indep. School Dist.*, 28 F.3d 521, 525 (5th Cir. 1994). However, the Court will first determine whether Knox can meet her burden of proof on her claims of discrimination.

Cir. 2007) ("[T]he inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983[ ] and Title VII .").  Thus, to survive summary judgment under each of these statutes, a plaintiff must present direct or indirect evidence of racial discrimination.

### 1. Direct Evidence of Discrimination

"Direct evidence is evidence, which if believed, proves the fact in question without inference or presumption."  *Jones v. Robinson Prop. Group*, 427 F.3d 987, 992 (5th Cir. 2005).  For a statement or remark to constitute direct evidence of racial discrimination, it must meet the four-factor test in *Auguster v. Vermilion Parish School Board*, 249 F.3d 400, 405 (5th Cir. 2001): the statement must be (1) related to the protected class of persons of which the plaintiff is a member, (2) proximate in time to the employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue.

In this case, Knox alleges that she has direct evidence of discrimination because she "heard from others in the work force that Hopkins planned to replace the white female clerks with blacks, as 'it should be.'" [Doc. No. 63, p. 18 (quoting Exh. A, Knox Aff., ¶ 18)].  In her affidavit, Knox avers as follows:

> KNOX believes Hopkins wanted to terminate KNOX to make a position for Estella W[a]rbington.  Charles "Cadillac" Dorsey, a sanitation operator announced one day in KNOX's presence that Hopkins said he was go[i]ng to replace the two white ladies in the office with two black ladies, like it should be.  When Hopkins took over, he said he was moving KNOX and Munoz to the rear back dock.  KNOX and Munoz had always been located at the front public entrance to the sanitation and public works department.  It was part of their job to greet and speak to members of the public.

[Doc. No. 63, Exh. A, Knox Aff., ¶ 18].

Knox also cites to Hopkins's "statements [of racism] to union membership," relying on her own deposition testimony. [Doc. No. 63, p. 18 (citing Doc. No. 63, Exh. I, Knox Depo., pp. 18-22)]. However, Knox testified that her co-worker Dorsey (incorrectly named or transcribed as "Charles Dawson") was the only person from whom she heard this statement.

Knox also testified that Hopkins told her and Munoz that he intended to move them to offices on the dock and hire his own clerk and secretary, but he never named any person he intended to hire nor did he state that he wished to do so based on race. Later, Knox "heard several people talking about [Hopkins had] said that he was going to move [Warbington] into that position until Mr. Janway told him he couldn't hire anyone else." [Doc. No. 63, Exh. I, Knox. Depo., pp. 22].

Of these statements, the only possible "direct" evidence of discrimination is the double hearsay statement from Dorsey to Knox that Hopkins wanted to replace the "white ladies" in the office with "black ladies." *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). While Hopkins's alleged statement to Dorsey is "non-hearsay" as an admission by a party opponent, Fed. R. Evid. 801(d)(2), Dorsey's recitation of the alleged statement to Knox is clearly hearsay. Knox has not argued that any exception renders this statement admissible nor does the Court find any exception which would be applicable. Even if the residual exception might otherwise apply, the Court cannot find the statement is sufficiently trustworthy when Dorsey later denied under oath that he had heard any "racial comments" in the Sanitation Department and there is no other evidence suggesting that Dorsey's alleged earlier

13

statement is the "true" version. [Doc. No. 57, Exh. H, Dorsey Depo., pp. 23-24].

Likewise, Knox's testimony that "several people" talked about Hopkins's alleged plan to move Warbington into a secretarial position is inadmissible hearsay.

Since Knox has presented no admissible direct evidence of discrimination, the Court will analyze her claims under the traditional burden-shifting framework applicable to circumstantial evidence of discrimination.

### 2. Circumstantial Evidence of Discrimination

When a plaintiff relies on circumstantial evidence of discrimination, courts employ the traditional burden-shifting framework. First, the plaintiff must establish a prima facie case by showing that (1) she is a member of a protected class, (2) she is qualified for the position at issue, (3) she was subject to an adverse employment action, and (4) she was replaced by someone outside the protected class or that similarly situated individuals outside the protected class were treated more favorably. *See Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001) (internal quotation marks and citations omitted).

If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the adverse action. *Id.* at 512.

Finally, if the defendant meets its burden of production, then the burden shifts back to the plaintiff. Defendants incorrectly argue in their memoranda that at this stage a plaintiff is required to demonstrate "'*both* that the reason [given by the employer for the action taken] was false, *and* that discrimination was the real reason.'" [Doc. No. 71, p. 1 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 n.4 (1993) (bracketed text in original))]; *see also* [Doc. No. 57, p. 16]. This "pretext-plus" standard is not the law for the Court's analysis of a summary judgment

motion and has not been the law for the past eight years following the Supreme Court's decision

in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). As the Fifth Circuit recently

stated:

> We first note the district court erred in applying the pretext-plus standard in light
> of the Supreme Court's decision in *Reeves* . . . The pretext-plus standard
> generally required plaintiffs to introduce evidence that the employer's asserted
> [non-discriminatory] justification was false and that the employer's real reason for
> taking the adverse action was [discriminatory]. *See Chaffin v. John H. Carter Co.*,
> 179 F.3d 316, 320 (5th Cir. 1999). Reeves rejected that standard. *See Reeves*, 530
> U.S. at 146-49 . . . . After *Reeves*, "a plaintiff's prima facie case, combined with
> sufficient evidence to find that the employer's asserted justification is false, may
> permit the trier of fact to conclude that the employer unlawfully [engaged in
> discrimination]. *Id.* at 149 . . . . Upon such a showing, summary judgment for the
> employer is appropriate only if there are "unusual circumstances" that would
> preclude the trier of fact from finding for the plaintiff. *See id.; Blow v. City of San
> Antonio*, 236 F.3d 293, 298 & n. 3 (5th Cir. 2001).[14]

*McArdle v. Dell Products, L.P.*, No. 07-51159, 2008 WL 4298840, at *6 (5th Cir. Sept. 22,

2008); *see also Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568, 575 (5th Cir. 2004).

(In *Reeves*, the Supreme Court held that "'a plaintiff's prima facie case, combined with sufficient

evidence to find that the employer's asserted justification is false, may permit the trier of fact to

conclude that the employer unlawfully discriminated.' . . . Thus, Reeves was intended to clarify

the judiciary's understanding of the evidentiary burden of production plaintiffs must meet to

survive McDonnell Douglas burden shifting analysis.") (quoting *Reeves*, 530 U.S. at 146-48).[15]

_____

[14]The *McArdle* case involved a claim of FMLA retaliation, but the original Supreme
Court decision, *Reeves*, was a discrimination case. The Court's alterations to the quoted text are
only to show the application of the law to claims of discrimination.

[15]Alternatively, a plaintiff may proceed under a mixed motive theory and meet her burden
by showing that "the defendant's reason, while true, is only one of the reasons for its conduct,
and another 'motivating factor' is the plaintiff's protected characteristic." *Rachid v. Jack in the
Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (internal quotation marks and citation omitted).
Although Knox quoted the case law on both the pretext and mixed motive theories, she has

Defendants concede, for purposes of summary judgment, that Knox can establish her prima facie case. Knox is a member of a protected class, she was qualified for her former clerical position with the City, she was terminated, and she was replaced by Warbington, who is black.

Likewise, Defendants have met their burden of production by proffering a legitimate, non-discriminatory reason for Knox's termination: excessive absenteeism.

The true question before the Court is whether Knox has produced sufficient evidence to raise a genuine issue of material fact for trial whether the reason for her termination is false. The Court finds that she has.

If the jury were to believe Knox's evidence and testimony, Hopkins created a new attendance policy that was more restrictive than that contained in the Handbook or CBA, failed to communicate the new policy, failed to apply the City's progressive discipline policy, and failed to warn Knox that she faced immediate discharge because of her absences. On its face, the written warning that Hopkins issued to Knox required her to "submit proper doctor's certification" for each absence and that if she could not "provide a doctor's certificate upon [her] return, [she would] be suspended for one week." If she then continued to be absent without "bring[ing] in an excuse," the warning stated that she would be discharged. Knox, however, has testified that she gave a doctor's excuse for each of her absences to Benton, including the one for January 27, 2005. While Benton's testimony is not clear whether she recalls receiving Knox's January 27 excuse, she did testify that it was her normal practice to place any excuse given to her in the employee's personnel file and to tell the supervisor. In his deposition, Hopkins testified

---

argued only under the pretext theory. Therefore, the Court has analyzed her claim under the pretext theory.

that he "didn't know" if Knox provided a doctor's excuse or not when he discharged her, but that it "didn't matter" because he had talked to her about being absent. [Doc. No. 63, Exh. F, pp. 81, 139]. However, Janway, Hopkins's boss, who upheld Knox's termination, stated in his deposition that an employee who provides a doctor's excuse should not be discharged. While this Court is well aware of its duty to avoid judicial second-guessing of employment decisions, the evidence in this case is sufficient to raise a genuine issue of material fact as to the veracity of Hopkins's stated reason for discharging Knox.

The Court has also considered Defendants' evidence that Hopkins discharged other white and black employees for absenteeism and other work rule violations, that the percentage of white and black employees remained "virtually the same" in the Sanitation Department after Hopkins became the Superintendent, and that personnel changes made by Hopkins were to replace Spatafora's employees with employees he had worked with previously. If the Court were permitted to weigh evidence at the summary judgment stage, then it might well be that Defendants would prevail. Likewise, this evidence may be sufficient to defeat Knox's claim at trial. However, this case is before the Court on summary judgment. Under applicable Supreme Court and Fifth Circuit precedent, Knox has raised a genuine issue of material fact for trial whether the reason proffered by Hopkins for her discharge was false. That evidence combined with her prima facie case is all that is required to defeat Defendants' Motion for Partial Summary Judgment on her claims of race discrimination under Title VII.

With regard to her § 1981 claims asserted through § 1983, however, the Court must conduct further analysis.

### 3.     Municipal Liability

When a plaintiff pursues a § 1981 claim of race discrimination against a public employer or its actors, the plaintiff must bring that claim under 42 U.S.C. § 1983.[16]  *See Oden v. Oktibbeha County, Miss.*, 246 F.3d 458, 463 (5th Cir. 2001) (The plaintiff could not "pursue a separate cause of action under § 1981 against Okitibbeha County and the Sheriff in his official capacity," without asserting that claim through § 1983); *see also* [Doc. No. 30, pp. 13-14 (citing same)]; *Felton v. Polles*, 315 F.3d 470, 482 (5th Cir. 2002) ("[W]hen a state employee seeks to hold an individual fellow state employee liable for damages for violation of § 1981 rights, such claim must also be pursued through the remedial provision of § 1983.").

"Municipal liability for civil rights violations under § 1983 is based on causation, not *respondeat superior*."  *Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 548 (5th Cir. 2008) (citing *Monell v. New York Dep't. of Soc. Serv.*, 436 U.S. 658, 692 (1978)).   "The fact that a tortfeasor is an employee or an agent of a municipality is therefore not sufficient for city liability to attach; the municipality must cause the . . . tort, which occurs 'when execution of a government's policy or custom, whether by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"  *Id.* (citing *Monell*, 436 U.S. at 694).   This Court previously cautioned Knox that she must amend her complaint to "allege a City policy or custom which resulted in the alleged race discrimination against her."  [Doc. No. 30, pp. 13-14].   Thus, even

---

[16]Title 42, U.S.C. § 1983, derived from § 1 of the Civil Rights Act of 1871, provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

though Knox has raised a genuine issue of material fact whether Hopkins discriminatorily discharged her, the City is not liable unless she also shows that a municipal custom or policy or the act of a final policymaker caused her § 1981 injury. *Evans v. City of Houston*, 246 F.3d 344, 358 (5th Cir. 2001) (In order for a plaintiff to recover against a municipality under § 1981, she "cannot proceed under a theory of respondeat superior and must instead satisfy the 'custom or policy' test fashioned for suits against a municipality under § 1983.") (citations omitted); *see also Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003) ("[A] municipality . . . cannot be held liable for the actions of its non-policy-making employees under a theory of respondeat superior.").

Knox does not contend that her discharge was the result of official City policy or a persistent, widespread practice constituting the custom of the City. *See Monell*, 436 U.S. at 691; *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Instead, Knox argues that the City is liable because Hopkins had final decision-making "authority for discharging employees within his department" and, "as the final policy maker in sanitation," he "decided to move whites away from the front office and to replace white office workers with black personnel." In effect, Knox relies on the "single incident exception," under which a municipality may be held liable based on a single incident or action if the decision was made by an individual with final policy making authority as determined under state and local law.[17] *See Gelin v.*

---

[17]Liability on this basis is rare because the act at issue must be taken with "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown v. Bryan County, OK*, 219 F.3d 450, 460-61 (5th Cir. 2000). There must be a "high degree of predictability concerning the consequences of the challenged decision." *Id.* at 460; *see also Burge v. St. Tammany Parish*, 336 F.3d 363, 372 (5th Cir. 2003) (A single incident may establish official policy "where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly

*Housing Auth. of New Orleans*, 436 F.3d 525, 527 (5th Cir. 2006) (quoting *Jett*, 491 U.S. at 737

(other citations omitted);  *see also Bolton*, 541 F.3d at 548 (To determine if a single action gives

rise to municipal liability, courts must determine "those officials or governmental bodies who

speak with final policymaking authority for the local government action"; "[t]his inquiry is

specific to the . . . action at issue . . . and depends on an analysis of relevant state and local law.")

(internal quotation marks and citations omitted).

The Court finds, first, that Hopkins did not have final decisonmaking authority to

discharge employees.  It is undisputed that his decision to discharge an employee is subject to

review by Janway, the Public Works Superintendent (and Hopkins's boss) and then by the

Mayor.  The Handbook provides a grievance process, which Knox initiated by presenting a

written grievance to Janway and meeting with him and Hopkins.  While Knox was not pleased

with the outcome, the fact that Janway failed to reinstate her does not convert Hopkins's action to

that of a final decisonmaker.

Second, even if Hopkins was a final decisionmaker with regard to Knox's discharge, the

Fifth Circuit has cautioned that courts cannot ignore the "fundamental" distinction between "final

decisionmaking authority and final policymaking authority."  *Bolton*, 541 F.3d at 548-49.  While

Hopkins made the initial decision to discharge Knox, he is not the final policymaker with regard

to City employment.

Pursuant to Article 6, Section 5 of the Louisiana Constitution and La. Rev. Stat. 33:1395,

*et seq.,* the City is a home rule charter city with a Mayor-Counsel form of government.  [Doc.

No. 57, Exh. J, Certified Copy of Home Rule Charter ("Charter"), Art. I, Sec. 1-03].  The Mayor

---

predictable consequence of a particular policy or failure to train.").

is the chief executive officer of the City and "shall exercise general executive and administrative authority over all departments, offices and agencies of the City, except as otherwise divided by this Charter."  [Doc. No. 57, Exh. J, Art. III, Sec. 3-01].  Article III, Sec. 3-01 of the Charter provides in pertinent part:

> A.    The mayor as chief executive officer of the City, shall have the following powers and duties:
>
> . . .
>
> (2)    Appoint and suspend or **remove all City administrative officers and employees** provided for under this charter, except as otherwise provided by law, this charter or civil service or other personnel rules adopted pursuant to this charter.  The mayor may authorize any administrative officer who is subject to the mayor's direction and supervision to exercise these powers with respect to subordinates in the officer's department, office or agency.
>
> . . .
>
> (4)    Direct and supervise the administration of all departments, offices and agencies of the City, except as otherwise provided by this charter . . .

[Doc. No. 57, Exh. J, Art. III, Secs. 3-09(A)(2) and (4) (emphasis added)].

Article IV, Section 4.01 of the Charter also provides that "all departments, offices, and agencies shall be under the direction and supervision of the mayor."  [Doc. No. 57, Art. IV, Sec. 4.01].

Finally, Section 4.06 of Article IV sets forth the responsibilities of the Public Works Director (Janway).  Although the Director is responsible for "[o]ther activities as may be directed by the mayor," the list of responsibilities does not include hiring and terminating of employees.  [Doc. No. 57, Exh. J, Art. IV, Sec. 4.06(B)(1-11)].

While the City does not dispute that the Mayor made a partial delegation of authority to department heads to institute certain administrative policies, both final policymaking authority and final decisionmaking authority for termination decisions remained with the Mayor.

Because Hopkins was not the final policymaker when he discharged Knox, the City is not liable under § 1983 for his decision, even if that decision violated her statutory rights under § 1981. Defendants are entitled to summary judgment on Knox's § 1981 claim, asserted through § 1983, against the City and Hopkins in his official capacity, and this claim is DISMISSED WITH PREJUDICE.

### 4.      Claim Against Hopkins in his Individual Capacity

Finally, Knox has asserted a claim of race discrimination against Hopkins in his individual capacity under § 1981, through § 1983. Hopkins moves for summary judgment on the basis that he is entitled to qualified immunity.

In evaluating the defense of qualified immunity, the Court engages in a two-step analysis. First, the Court must determine whether the defendant violated the plaintiff's constitutional or, in this case, statutory rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if the plaintiff's rights were violated, the Court must determine whether the defendant's actions were "objectively reasonable in light of clearly established law." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) (internal quotation marks omitted).

In this case, the Court has determined that Knox has raised a genuine issue of material fact for trial whether Hopkins violated her rights under § 1981 to be free from racially discriminatory discharge. Thus, Knox has met her threshold showing, and the Court must examine the second part of the test.

Hopkins may still be entitled to qualified immunity, but only if his actions in discharging Knox were objectively reasonable in light of clearly established law. In *Blackwell v. Laque*, 275 Fed.Appx. 363, 2008 WL 1848119 (5th Cir. 2008), the Fifth Circuit was faced with a similar case. The plaintiffs, three African-American women, brought suit against St. Charles Parish and its Parish President, Laque. The plaintiffs asserted, *inter alia*, claims of race discrimination under Title VII and §§ 1981 and 1983. The district court denied summary judgment on the plaintiffs' race discrimination claims and held that Laque was not entitled to qualified immunity.

On interlocutory appeal of the qualified immunity ruling, the Fifth Circuit accepted the district court's determination that the plaintiffs had established a prima facie case for summary judgment purposes and found that the prima facie case was sufficient to establish a constitutional or statutory violation. With regard to the second part of the test, the Fifth Circuit held as follows:

> We next consider the second qualified immunity prong: whether Laque's actions were objectively reasonable in light of clearly established law. *See Goodson*, 202 F.3d at 736. It was clearly established that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination of the sort alleged. Further, the district court found that a genuine dispute exists about whether white employees were treated more favorably. Viewing the facts in the light most favorable to the Plaintiffs, as we must, we cannot conclude that Laque's actions were objectively reasonable under clearly established law. *See Kinney* [*v. Weaver*, 367 F.3d 337, 348 (5th Cir.2004) (en banc)]. Thus, Laque is not entitled to qualified immunity on this claim.

*Id.* at 367, 368.

While *Blackwell* is not precedent, the Court finds the analysis persuasive. Knox has also raised a genuine issue of material fact whether Hopkins's actions were objectively reasonable, in light of the prohibitions against race discrimination contained in both the Equal Protection Clause and in § 1981. Hopkins's Motion for Summary Judgment on the § 1981 claim against

him in his individual capacity is DENIED.

**III.     CONCLUSION**

For the foregoing reasons, the City's Motion for Partial Summary Judgment [Doc. No. 57] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Knox's claims against the City and Hopkins in his official capacity for race discrimination in violation of § 1981, asserted through § 1983, and these claims are DISMISSED WITH PREJUDICE. The motion is DENIED as to Knox's claim against the City for race discrimination in violation of Title VII and her claim against Hopkins in his individual capacity for race discrimination in violation of § 1981, asserted through § 1983. These two claims remain pending for trial.

MONROE, LOUISIANA, this 8th day of January, 2009.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE